UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| PAUL F. DESCOTEAU, ) | |
| ) | |
| Plaintiff ) | |
| ) | |
| v. ) | Civil No. 08-144-P-S |
| ) | |
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Defendant ) | |

### RECOMMENDED DECISION ON MOTION FOR SUMMARY JUDGMENT

The defendant, the United States of America, moves for summary judgment in this action under the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq*. I recommend that the court deny the motion.

### I.  Summary Judgment Standard

### A.  Federal Rule of Civil Procedure 56

Summary judgment is appropriate only if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Santoni v. Potter*, 369 F.3d 594, 598 (1st Cir. 2004).  "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party." *Rodríguez-Rivera v. Federico Trilla Reg'l Hosp. of Carolina*, 532 F.3d 28, 30 (1st Cir. 2008) (quoting *Thompson v. Coca-Cola Co.*, 522 F.3d 168, 175 (1st Cir. 2008)). "A fact is material if it has the potential of determining the outcome of the litigation." *Id*. (quoting *Maymi v. P.R. Ports Auth.*, 515 F.3d 20, 25 (1st Cir. 2008)).

The party moving for summary judgment must demonstrate an absence of evidence to

1

support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In determining whether this burden is met, the court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor. *Santoni,* 369 F.3d at 598. Once the moving party has made a preliminary showing that no genuine issue of material fact exists, the nonmovant must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999) (citation and internal punctuation omitted); Fed. R. Civ. P. 56(e). "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party." *In re Spigel*, 260 F.3d 27, 31 (1st Cir. 2001) (citation and internal punctuation omitted).

### B.  Local Rule 56

The evidence that the court may consider in deciding whether genuine issues of material fact exist for purposes of summary judgment is circumscribed by the Local Rules of this District. *See* Loc. R. 56. The moving party must first file a statement of material facts that it claims are not in dispute. *See* Loc. R. 56(b). Each fact must be set forth in a numbered paragraph and supported by a specific record citation. *See id*. The nonmoving party must then submit a responsive "separate, short, and concise" statement of material facts in which it must "admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts[.]" Loc. R. 56(c). The nonmovant likewise must support each denial or qualification with an appropriate record citation. *See id*. The nonmoving party may also submit its own additional statement of material facts that it contends are not in dispute, each supported by a specific record citation. *See id*. The movant then must respond to the nonmoving

party's statement of additional facts, if any, by way of a reply statement of material facts in which it must "admit, deny or qualify such additional facts by reference to the numbered paragraphs" of the nonmovant's statement.  *See* Loc. R. 56(d).  Again, each denial or qualification must be supported by an appropriate record citation.  *See id*.

Failure to comply with Local Rule 56 can result in serious consequences.  "Facts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted."  Loc. R. 56(f).  In addition, "[t]he court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment" and has "no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of fact."  *Id*.; *see also, e.g., Sánchez-Figueroa v. Banco Popular de Puerto Rico*, 527 F.3d 209, 213-14 (1st Cir. 2008).

## II.  Factual Background

The following undisputed material facts are appropriately presented in the parties' statements of material facts submitted in accordance with Local Rule 56.

The plaintiff served in the Coast Guard from 1966 through 1970.  Defendant's Statement of Material Facts ("Defendant's SMF") (Docket No. 16) ¶ 1; Plaintiff's Response to Defendant's Statement of Material Facts ("Plaintiff's Responsive SMF") (Docket No. 23) ¶ 1.  After his discharge, the plaintiff traveled in Europe and North Africa until he contracted hepatitis.  *Id*.  After treatment, he was advised that he was not required to take any medications although he may have had a loss of liver function.  *Id*.  He does not think that the hepatitis attack affected his ability to work.  *Id*.

After attending a variety of schools, the plaintiff moved to Maine, where he lived in a family beach house in Saco and worked in the Portland area. *Id.* ¶ 2. He has resided in Maine and worked at various jobs for 26 years. *Id.* For the past 25 years, he has been a general contractor and has operated "Descoteau Building and Remodeling." *Id.* ¶ 3. This business primarily involves renovating and repairing beach houses, mostly during the fall and spring. *Id.* The plaintiff coordinates subcontractors on his jobs but has no employees. *Id.* Until 2008, he operated "Saco Bay Sailing" for 20 years, taking people on tours. *Id.*

For a number of years, the plaintiff has received medical care through the Veterans Health Administration Medical Center at Togus, Maine, which includes the Community Based Outpatient Clinic in Saco. *Id.* ¶ 4. His primary care physician is Dr. Robert Ashley at the Saco Clinic, with whom he continues to treat. *Id.* Dr. Martyn Vickers and other physicians located at the Togus hospital have also treated him. *Id.*

In about 2000, the plaintiff was advised that his PSA blood test results relating to his prostate were elevated. *Id.* ¶ 5. He began seeing Dr. Vickers, a urologist, in 2002. *Id.* Dr. Vickers told him that there was a greater than 50 percent probability that he had prostatic cancer. *Id.* On December 31, 2002, Dr. Vickers suggested that the plaintiff have a prostate biopsy to determine whether he had prostate cancer. *Id.* ¶ 6. The plaintiff was offered an opportunity to have the biopsy done at a VA facility in Boston but he understood that, due to a scheduling backlog, he would have to wait as much as a year and a half to have the test done there. *Id.*

As a result, the plaintiff asked Senator Collins to urge the VA to expedite the purchase of a new prostate exam machine for the Togus hospital. *Id.* ¶ 7. Within about three months, he was advised that the Togus hospital had acquired a new machine. *Id.* The VA advised Senator Collins that the plaintiff would shortly receive a letter confirming an appointment at Togus for

the biopsy. *Id*. Dr. Vickers was the only VA urologist performing prostate biopsies at Togus at the time of the plaintiff's procedure. *Id*. ¶ 8.

On February 7, 2003, the plaintiff had a prostate biopsy at the Togus VA. *Id*. ¶ 9. Dr. Vickers told the plaintiff that he had never used this machine before so he was not certain about the length of the procedure. *Id*. ¶ 10. Before the procedure, the plaintiff was informed about the procedure by Dr. Vickers and signed a consent form. *Id*. The procedure was fairly lengthy. *Id*. ¶ 12. The progress notes state that there were no "unusual events" during the procedure. *Id*. The plaintiff was sent home with post-surgery instructions to contact the VA if he had certain symptoms. *Id*. He did not contact the VA post-surgery. *Id.*

In February 2003, the VA Urology Clinic usually had two clinic personnel preparing the room and providing patient care and assistance to the physician during prostate ultrasound guided biopsies. *Id*. ¶ 14. One person would provide the direct patient care and the other would do the computer documentation and high level disinfection of the equipment. *Id*.

On February 14, 2003, the plaintiff was notified of the biopsy results, that his PSA was elevated, and that there would be follow-up in six months. *Id*. ¶ 16. The biopsy did not show cancer cells, but the results were suspicious, so that active monitoring was discussed. *Id*. Monitoring included checking the plaintiff's PSA test at least every quarter. *Id*. Although the plaintiff went to various physical examinations, medical examinations, and consultations concerning potential prostate cancer, he still performed and provided general contracting services in 2003. *Id*. ¶ 17.

During patient safety rounds in the Urology Clinic on January 26, 2006, VA employees observed that the Rectal Transducer and puncture guides used for prostate biopsies appeared to be improperly cleaned and disinfected. Plaintiff's Statement of Additional Material Facts

("Plaintiff's SMF") (included in Plaintiff's Responsive SMF beginning at 5) ¶ 2; Defendant's Response to Plaintiff's Statement of Additional Material Facts ("Defendant's Responsive SMF) (Docket No. 27) ¶ 2. The puncture guides are a part of the transducer probe and are used to guide the insertion of the biopsy needle. *Id.* ¶ 3.

The VA procedure at the time was to clean the guides, using methods that did not include a brush, and sanitizing (or "reprocessing") the guides so that they could be used in subsequent patients. *Id.* ¶ 5. The Falcon Ultrasound Scanner, Type 2101 Users Guide states, "Pass a suitable brush through any puncture canals to reduce the bioburden." *Id.* ¶ 7. Instructions for the 8808 model, which was used in the plaintiff's biopsy, state that "[t]he single-use no-sterile cleaning brush, QZ0039, should always be used to clean the needle guides . . . after transrectal biopsy to remove biological matter and ultrasound gel." *Id.* ¶ 8.

By letter dated April 14, 2006, the plaintiff received the following information:

> This letter is to follow up regarding your prostate biopsy on February 7, 2003, performed at our facility. We have recently determined that some of our devices used to perform prostate biopsies may not have been satisfactorily sterilized or disinfected. When VA becomes aware of a potential problem, it is our practice to notify the individuals involved. We wanted to let you know that there is a very small chance that you could have been exposed to hepatitis B virus, hepatitis C virus, or the human immunodeficiency virus (HIV). Therefore, we are offering you the opportunity to return to VA for blood tests for these infections. I want to assure you that we have no evidence that any patient who had a prostate biopsy with this equipment has acquired any of these infections. But because a very small risk may exist, we want you to know about it. Also, we have no reason to believe that there . . . was any problem with your biopsy test results and there is no need for an additional biopsy because of the situation described in this letter.
>
> The decision to offer you testing has been made in consultation with the manufacturer of the prostate biopsy device, the Centers for Disease Control and Prevention, and the Food and Drug Administration. We have staff available to take your questions. For additional information or to arrange for blood tests at VA where and when it is convenient for you, call Mary Anderson, RN, Infection Control Nurse . . . [.] You may also

6

> want to discuss any concerns you may have with your primary care provider, Dr. Robert Ashley[.]
>
> Please accept my deep regret and apology to you for the situation that led to this letter. I also want to assure you that we are taking all the necessary steps to ensure that this situation does not occur again. We understand our responsibility and the trust that you place in us and I want to let you know that we are doing everything we can to continue to receive your trust. If your questions or needs are not adequately addressed by calling the number above, please contact my office locally . . . and someone on my staff will return your call.

Defendant's SMF ¶ 19; Plaintiff's Responsive SMF ¶ 19.

The plaintiff called his ex-wife because he was "pretty upset" and was looking for advice as to what he should do. *Id*. ¶ 20. They spoke for 30 to 45 minutes and decided that the plaintiff should have the offered blood test performed. Id. The plaintiff called and spoke briefly with Mary Anderson. Id. ¶ 21. He was seen at the Saco Clinic on April 18, where he scheduled a blood test for April 27 and a later consultation to review the results. *Id*. He did not call Dr. Ashley. *Id*. Between April 14 and April 27, the plaintiff discussed the matter with several friends and associates. *Id*. ¶¶ 22-23.

As part of the VA's preparation for potential questions from the patients who might call in response to the April 14, 2006, letter, Anderson and others were given a sample script. *Id*. ¶ 27. Anderson generally followed the script, which emphasized that there was only "a very small possibility that a piece of equipment used in prostate biopsies could present a risk." *Id*.

According to the medical record, the plaintiff spoke with Karen Tibbetts, a nurse at the Saco clinic, on April 18, 2006, *Id*. ¶ 28. She recorded that he

> appears very relaxed, states he has talked to Mary Anderson @ Togus and they were joking about how he was responsible for getting the equipment when his biopsy was cancelled due to [the] old machine being broken and he got Senator Snowe involved in getting this new equipment and therefore he was the very first person to have [the] procedure done with it. He has high praise for Dr. Vickers and the VA.

7

*Id*.  The plaintiff went in for a blood test on April 27, 2006.  *Id*. ¶ 29.  He received pre-test counseling from Dr. Ashley and signed an HIV test consent form.  *Id*.  He was advised that receipt of the test results might take three weeks and that he would be notified as soon as the results were received.  *Id*.

Between the day of the blood test and his receipt of the results, the plaintiff continued to talk with friends and acquaintances about his concerns.  *Id*. ¶ 31.  At the time, the plaintiff was dating a woman who lived and worked in Washington, D.C., and also had a "beach house" in Saco.  *Id*. ¶ 32.  Her schedule for being in Maine was very uneven.  *Id*. ¶ 33.  After receiving the April 14 letter and during the time he was awaiting the results from the blood test, the plaintiff probably e-mailed this woman about the letter.  *Id*. ¶ 35.  He does not remember whether he had any face-to-face communication with her about this before he received the negative results of the test.  *Id*. ¶¶ 35-36.

On May 11, 2006, the plaintiff went to the VA Clinic in Saco to receive the results of the blood test.  *Id*. ¶ 37.  He knew that it was VA policy not to give the results over the telephone. *Id*.  At that visit, he spoke with Dr. Ashley for about 45 minutes.  *Id*.  Dr. Ashley "was pleased to let [him] know that it [the test] came back negative."  *Id*. ¶ 38.  Dr. Ashley also discussed his ongoing cancer prognosis with the plaintiff.  *Id*.  His main concern was the need to monitor actively the plaintiff's PSA condition.  *Id*.  The plaintiff has not been treated by a counselor, therapist, or medical professional for any mental, emotional, psychological, or psychiatric issues. *Id*. ¶ 39.

The April 14 letter was send to 504 veterans.  *Id*. ¶ 40.  There were a few cases of hepatitis in patients not previously known to have been infected; however, the way these reports

were spread out over the patient population over time made them medically unlikely to have been related to those patients' prostate biopsies. *Id*.

After meeting with Dr. Ashley, the plaintiff "felt a lot better." *Id*. ¶ 41. At his next meeting with a urologist, either Dr. Vickers or Dr. Leidinger, the plaintiff had no additional discussions regarding the negative blood test results. *Id*. He celebrated with his friends and let everyone know that the results were good news. *Id*. ¶ 42. As soon as he received the results, he contacted his girlfriend and told her the results. *Id*. ¶ 43. He continued to see her for almost another six months. *Id*. By the time he received the blood test results, his relationship with this woman was "waning." *Id*. ¶ 44.

The plaintiff continues to have intimate relationships with girlfriends, and there has been no change in these relationships because of concerns raised by the April 14 letter. *Id*. ¶ 45. His lifestyle and recreational activities have remained the same over the past 20 years. *Id*. ¶¶ 45-46. The incident has had no impact on his current ability to perform his job. *Id*. ¶ 47. The plaintiff cannot envision any future medical expenses related to this incident. *Id*. ¶ 48.

The plaintiff characterized "[b]eing notified of the possibility of being infected with Hepatitis or HIV and having to be tested and wait for the results [as] a very traumatic experience." Plaintiff's SMF ¶ 13; Defendant's Responsive SMF ¶ 13.

### III. Discussion

The complaint alleges a single count of negligence. Complaint (Docket No. 1). In his memorandum of law submitted in opposition to the government's motion for summary judgment, the plaintiff limits his claim to one for negligent infliction of emotional distress. Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Opposition") (Docket No. 22) at 3, 10.

Maine law is applicable. *Patterson v. United States*, 599 F.Supp.2d 34, 39-40 (D. Me. 2009). The elements of a claim of negligent infliction of emotional distress in Maine are similar to those for most negligence torts:

> a plaintiff must set forth facts from which it could be concluded that (1) the defendant owed a duty to the plaintiff; (2) the defendant breached that duty; (3) the plaintiff was harmed; and (4) the breach caused the plaintiff's harm.

*Curtis v. Porter*, 2001 ME 158, ¶ 18, 784 A.2d 18, 25.

> Plaintiffs claiming negligent infliction . . . face a significant hurdle in establishing the requisite duty, in great part because the determination of duty in these circumstances is not generated by traditional concepts of foreseeability. Although each person has a duty to act reasonably to avoid causing physical harm to others, there is no analogous general duty to avoid negligently causing emotional harm to others.
>
> Nevertheless, we have recognized a duty to act reasonably to avoid emotional harm to others in very limited circumstances: first, in claims commonly referred to as bystander liability actions; and second, in circumstances in which a special relationship exists between the actor and the person emotionally harmed. We have also held that a claim for negligent infliction of emotional distress may lie when the wrongdoer has committed another tort. However, as we have recently held, when the separate tort at issue allows a plaintiff to recover for emotional suffering, the claim for negligent infliction of emotional distress is usually subsumed in any award entered on the separate tort.

*Id*. ¶¶ 18-19, 784 A.2d at 25-26 (footnote and citations omitted).

### A. Duty

The plaintiff in this case has chosen to cast his claim as one in which a special physician-patient relationship existed between him and the VA. Opposition at 4. *See Bolton v. Caine*, 584 A.2d 615, 618 (Me. 1990). The government concedes that the VA had such a relationship with the plaintiff and thus had a duty to avoid causing him emotional harm. Reply to Plaintiff's Opposition [to] Defendant's Motion for Summary Judgment ("Reply") (Docket No. 26) at 1. The first element of the claim accordingly is established.

10

## B. Breach

The plaintiff contends that this duty was breached when VA employees "(1) ignored the written instruction found in the cleaning instructions provided with the transducer assembly and (2) failed to take reasonable precautions including making visual inspections of all surgical equipment before using it upon its patients." Opposition at 4. He also argues that "whether or not the inadequate measures Defendant took to sanitize the transducer assemblies was a negligent dereliction of its duty to protect its patients . . . is a question best left to the trier of fact, not a motion for summary judgment." *Id*. at 8.[1]

To the contrary, if the plaintiff proffers evidence at the summary judgment stage that could not allow a reasonable factfinder to conclude that the defendant breached the duty to him on which he relies, then the court has an obligation to enter summary judgment on that claim. Here, the defendant contends that the plaintiff is required to show that the VA's failure to use a brush to clean the needle guides on the biopsy equipment necessarily meant that the equipment not only was not adequately clean but also that the equipment "was not microbiologically clean." Reply at 1. Neither party cites any authority for his or its position. The defendant goes on to assert that only an expert witness can offer such evidence, and, as the plaintiff has not named an expert witness, the defendant is entitled to summary judgment.

While, as the defendant argues, "[t]he methods used to remove viral pathogens from biopsy devices are not within common knowledge," *id*. at 4, it does not follow that the plaintiff has to prove that the method used by the VA was somehow deficient. The undisputed fact is that the defendant sent a letter to the plaintiff and all other patients who had been tested using the

---

[1] The authority that the plaintiff cites in support of the proposition that "[summary judgment] is almost always inappropriate in negligence cases," Opposition at 3, dates from 1970 and has been overtaken by case law developments. *See, e.g., Curtis*, 784 A.2d at 21-22 ("Summary judgment is no longer an extreme remedy. It is simply a procedural device for obtaining judicial resolution of those matters that may be decided without fact-finding.").

11

equipment in question, informing them that the equipment "may not have been satisfactorily sterilized or disinfected" and that "there is a very small chance that you could have been exposed to hepatitis B virus, hepatitis C virus, or the human immunodeficiency virus (HIV)." Defendant's SMF ¶ 19; Plaintiff's Responsive SMF ¶ 19. That language in the letter seems to me to be an admission of a breach of the duty that a medical facility owes to its patients to keep the medical equipment used on them as clean as possible, so as not to cause them further medical harm. Expert testimony is not required to understand this fundamental concept. *See Forbes v. Osteopathic Hosp. of Maine*, 552 A.2d 16, 17 (Me. 1988). The plaintiff has produced sufficient evidence to avoid summary judgment based on the second element of his sole claim.

### C. Harm and Causation

The third and fourth elements of the claim are harm, caused by the breach of duty. In the context of a claim for negligent infliction of emotional distress, harm must be serious or severe emotional distress.[2] Such emotional distress must be "so severe that no reasonable [person] could be expected to endure it." *Curtis*, 2001 ME 158, ¶ 10, 784 A.2d 18, 23 (quoting *Champagne*, 1998 ME 87, ¶ 15, 711 A.2d at 847). "Serious emotional distress exists where a reasonable person[,] normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the event." *Town of Stonington v. Galilean Gospel Temple*, 722 A.2d 1269, 1272 (Me. 1999) (citation and internal punctuation omitted). The plaintiff must show that the harm alleged reasonably could have been expected to befall the ordinarily sensitive person, rather than a supersensitive person. *Theriault v. Swan*, 558 A.2d 369, 372 (Me. 1989).

---

[2] The defendant's conduct, as demonstrated by the evidence submitted by both parties, was not so extreme or outrageous that harmful emotional distress may be inferred. *See Vicnire v. Ford Motor Credit Co.*, 401 A.2d 148, 154 (Me. 1979). This is a decision that is reserved to the court. *Champagne v. Mid-Maine Med. Ctr.*, 1998 ME 87, ¶ 16, 711 A.2d 842, 847.

While it is true, as the plaintiff asserts, Opposition at 8, that the emotional distress for which damages are recoverable under Maine law includes a reasonable fear of a future illness, *Murray v. Bath Iron Works Corp.*, 867 F. Supp. 33, 49 (D. Me. 1994), the evidence that the plaintiff has submitted on this point makes the summary judgment question a close one. The admissible evidence of his alleged severe emotional distress, according to the plaintiff, is the following:

1. "[A] 'stoic kind of guy,'"[3] he "broke down in recounting the traumatic experience of telling his daughter he had been potentially exposed to life[-]threatening blood born[e] pathogens."

2. "Being notified of the possibility of being infected with Hepatitis or HIV and having to be tested and wait for the results [was] a very traumatic experience."

3. He admitted being "pretty upset" when "he reached out to his ex-wife, a nurse practitioner, the day he received the VA's letter notifying him of the potential exposure."

4. He "had a great fear in reliving [the] time in his life" when he was exposed to hepatitis in 1971, including six weeks of isolation.

5. "The exposure led to the eventual breakup of a romantic relationship."

6. "He missed at least five days of work as a result of having to deal with the effects of Defendant's actions."

7. He "was forced to submit to invasive and potentially painful blood testing to make sure Defendant's negligence had not resulted in being infected."

Opposition at 9.

---

[3] The defendant's qualification of the paragraph of the plaintiff's statement of material facts on which this item is based, Defendant's Responsive SMF ¶ 12, is well-taken. The only authority cited for the characterization of the plaintiff as "a stoic kind of guy" is an attorney's observation at the plaintiff's deposition, Plaintiff's SMF ¶ 12, and an attorney's observation is not evidence.

13

Item 5 on this list is an embellishment of the evidence in the summary judgment record. *See* Plaintiff's SMF ¶ 16, Defendant's Responsive SMF ¶ 16. The defendant contends that item 6 must be stricken from the summary judgment record because the plaintiff testified differently at deposition from the statement quoted in this item, which is based on the plaintiff's answers to interrogatories. Reply at 5.

Contrary to the defendant's contention, I cannot conclude that the rule of *Colantuoni v. Alfred Calcagni & Sons, Inc.*, 44 F.3d 1, 4-5 (1st Cir. 1994), applies under these circumstances. In that case, the First Circuit held that a party cannot create a dispute of material fact for purposes of opposing summary judgment by submitting an affidavit contradicting what that party clearly answered to unambiguous questions at deposition, without an adequate explanation for the change.

Here, the plaintiff testified at deposition in a manner that qualified a more definite statement (that he had missed 5 days from work) to which he had sworn in his answers to interrogatories. The later deposition testimony (that he could not quantify how much work he missed and had no records) is actually more favorable to the defendant than was the interrogatory answer. No intent to create a disputed issue of material fact may be inferred under the circumstances here. The inconsistency certainly raises a question as to the weight to be given the plaintiff's testimony at trial, but it does not require that the court disregard the testimony altogether at the summary judgment stage of this proceeding.

In light of the fact that the plaintiff was told two weeks after he was tested and approximately one month after he received the VA's letter that he had not been infected with any form of hepatitis or HIV, *see* Defendant's SMF ¶¶ 19, 29, 37; Plaintiff's Responsive SMF ¶¶ 19, 19, 37, the evidence does not present a very strong picture of severe emotional distress.

14

Nonetheless, given the indulgent reading required in connection with a motion for summary judgment, I find the evidence here sufficient on this point and conclude that the defendant is not entitled to summary judgment on this basis. *See, e.g., Town of Stonington*, 722 A.2d at 1272 (throbbing headaches and depression, and tightened neck muscles requiring use of relaxants and a collar support finding of serious emotional distress).

To the extent that the defendant argues that emotional distress was not a foreseeable consequence of the failure adequately to clean a piece of medical equipment, leading to the "very small chance" that a patient had been infected with hepatitis or HIV, Reply at 7, such harm could reasonably be expected to befall the ordinarily sensitive patient hearing such news. The fact that "of the hundreds of patients notified of the BK lookback in Maine, [the plaintiff] is the only one to file a tort claim[,]" *id.*, does not change this conclusion. Not filing a claim against the possible tortfeasor in court is not a measure of "ordinary sensitivity" to a given tort.

### IV. Conclusion

For the foregoing reasons, I recommend that the motion for summary judgment be **DENIED.**

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within ten (10) days after being served with a copy thereof. A responsive memorandum shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 27th day of May, 2009.

/s/ John H. Rich III
John H. Rich III
United States Magistrate Judge

15